**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**LAKE EOLA BUILDERS, LLC,**

       **Plaintiff,**

**-vs-**　　　　　　　　　　　　　　　　　　　　　　　**Case No. 6:05-cv-346-Orl-31DAB**

**THE METROPOLITAN AT LAKE EOLA, LLC,**

       **Defendant.**
_____

## ORDER

This cause came on for consideration with oral argument on the following motions filed herein:

| | |
|---|---|
| **MOTION:** | **MOTION TO STRIKE THE AFFIDAVIT OF KIERNAN O'NEILL AND PORTIONS OF MEMORANDUM (Doc. No. 57)** |
| **FILED:** | **December 21, 2005** |

**THEREON** it is **ORDERED** that the motion is **DENIED**.

| | |
|---|---|
| **MOTION:** | **MOTION FOR PROTECTIVE ORDER (Doc. No. 59)** |
| **FILED:** | **December 23, 2005** |

**THEREON** it is **ORDERED** that the motion is **DENIED**.

At issue in the motions is whether certain communications between an attorney and a non-employee Owner's Representative are privileged, and if so, whether any such privilege was waived by the Owner's production of the communications, and subsequent disclosure and elaboration by the

Owner's Representative. For the reasons set forth herein, the Court finds that the movant has not satisfied its burden of establishing that the documents in question are privileged. The Court further finds that even if the documents were privileged, the privilege was waived.

Defendant, The Metropolitan at Lake Eola, LLC (herein "the Owner") seeks to strike the November 30, 2005, Affidavit of Kieran O'Neill submitted by Plaintiff Lake Eola Builders, Inc. (herein "the Contractor") in its Memorandum in Opposition to the Owner's Motion for Summary Judgment, along with portions of the Contractor's Memorandum in Opposition that reference and rely on the Affidavit. As grounds, Owner argues that the Affidavit includes discussions of and copies of emails between Mr. O'Neill, David Eichenblatt (purported to be the sole member of Arlen House Investments, LLC, which is the managing member of the Owner, a foreign limited liability company), and the Owner's then attorney, Brian Fielden. The emails are attached to the Affidavit (Doc. No. 55–2) and read, in pertinent part:

Nov. 20, 2003, Email from Fielden to O'Neill, copied to Eichenblatt and "Suto, Al":

> Kiernan, as we discussed on the phone on Wednesday with Pertree[1], Pertree must ensure that this LLC is licensed as a Florida General Contractor (Michael said that someone was going to transfer their GC's license to this new LLC). The lender required us to leave a blank on the contract where the license number would be filled in, and that blank was added in the last draft that was sent to Pertree. Since I will not see the draft that they will be signing, please make sure they enter the Florida GC license number for this LLC in that blank. Thanks.

Nov. 21, 2003, Email from Fielden to O'Neill, copy Eichenblatt:

> . . .Also, when you (or David) receive the contract from Pertree, please let me know (i) whether Pertree inserted a Florida General Contractor's license number . . .and (ii) if they did, whether they made any statements to you that the LLC was not actually

---

[1] According to the Affidavit of Michael Pertree, Pertree is the President of Pertree Constructors, Inc. and a manager of the Plaintiff Contractor (Doc. No. 60-2).

-2-

> licensed and that they were going to transfer a license to the LLC after the contract was signed. If they inserted a license number in contract, then presumably the LLC is licensed and we can rely in that representation. If, however, they made a representation to you that the LLC is not licensed and that they are going to transfer a license to the LLC at a later date, then we cannot sign the contract until the GC's license is transferred to the LLC.
>
> Under FL law, if a contractor does not have a GC's license, it cannot enforce its contract against the Owner (which, of course, is good for the Owner). There are also some cases that state that if the Owner has knowledge that the GC is not licensed, then the Owner cannot enforce the contract against the GC (or the GC's surety). Since you are the Owner's agent, any knowledge you have will be imputed to the Owner. . . .

The Owner contends that these emails are privileged in that O'Neill was acting as the Owner's "agent," representing the Owner in contract negotiations (Doc. No. 57 at 2), and communications between a company's agent and its attorneys are protected under the attorney-client privilege.

As this is a diversity case seeking relief under state law, the Court looks to the applicable state law to determine the privilege of a witness. Fed. R. Evid. 501. Here, Fla. Stat. § 90.502 provides that the "client has the privilege to refuse to disclose, and to prevent any other person from disclosing, the contents of confidential communications when such other person learned of the communications because they were made in the rendition of legal services to the client." To paraphrase the statute, "a communication is confidential if it is not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of legal services to the client and those reasonably necessary for the transmission of the communication." Fla. Stat. § 90.502(1)(c). Thus, this Court has noted the elements of the attorney-client privilege as:

> (1) Where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection may be waived.

-3-

*Universal City Development Partners, Ltd. v. Ride & Show Engineering, Inc.*, 230 F.R.D. 688, 690 (M.D. Fla. 2005) (quoting *Int'l Tel. & Tel. Corp. v. United Tel. Co.*, 60 F.R.D. 177, 184-85 (M.D. Fla.1973), which in turn, quoted Professor Wigmore, 8 Wigmore, Evidence § 2292 at 554 (McNaughton rev. 1961).)

The Florida Supreme Court has set forth a specific standard for review of claims of privilege in the corporate context. *See Southern Bell Tel. & Tel. Co. v. Deason*, 632 So.2d 1377, 1383 (Fla. 1994) ("Thus, to minimize the threat of corporations cloaking information with the attorney-client privilege in order to avoid discovery, claims of the privilege in the corporate context will be subjected to a heightened level of scrutiny.") Under this heightened level of scrutiny, courts are to evaluate the following criteria to determine whether a corporations communications are protected by the attorney-client privilege:

> 1) the communication would not have been made but for the contemplation of legal services;
> (2) the employee making the communication did so at the direction of his or her corporate superior;
> (3) the superior made the request of the employee as part of the corporation's effort to secure legal advice or services;
> (4) the content of the communication relates to the legal services being rendered, and the subject matter of the communication is within the scope of the employee's duties;
> (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.

*Southern Bell Tel. & Tel. Co. v. Deason*, 632 So.2d at1383.

Applying these standards to the communications at issue here, it is clear that the communications are not, and were not, privileged.

**The lawyer**

There is no dispute that the author of the emails is an attorney. Such, however, is not enough to render the document privileged. At issue is whether Fielden was acting as an attorney rendering

-4-

legal services in these communications, as opposed to facilitating business discussions. Although the Court scheduled oral argument on the motions and specifically noted the opportunity to present evidence at the hearing (Doc. No. 61), the Owner relied solely on the record. The record includes the Supplemental Affidavit of Michael Pertree (Doc. No. 60-2) and the Affidavit of Brian Fielden (Doc. No. 66). In the Supplemental Affidavit of Pertree, Pertree avers that Fielden "did not act as an attorney" for the Owner, but was instead the lead negotiator, negotiating directly with Pertree "as if he [Fielden] were the Owner." For his part, Fielden (who was counsel of record in this matter for a time) does not address the nature of his activities on behalf of the Owner, save for a cursory averment that he "represented" the Owner. Based on the sparse record before it, and review of the disputed communications, the Court finds the truth to be somewhere in the middle.

It is not unusual for an attorney to act outside the designated role as "legal advisor" in the course of representation of a client. Lawyers often wear the hat of financial advisors, business agents, and sympathetic confidant, and are sometimes called upon to evaluate or assist with a client's non-legal needs and concerns, including referral to other specialists. As is clear from the foregoing authorities, in order to be privileged, a communication must be sought in the course of obtaining legal advice from a lawyer acting in that capacity. Here, the evidence indicates that Fielden was not merely advising and carrying out the wishes of the party, but was much more heavily involved to the point of being indistinguishable from the client itself. Moreover, the gist of the communications were not in the context of seeking legal advice, but were openly and obviously business negotiations to get the contract executed. Business activity, as opposed to legal advice, is not protected by the attorney-client privilege. *United States v. Davis*, 636 F.2d 1028, 1043 (5th Cir. 1981). While there may well be some overlap between legal advice (the form of a bond, for example) and business advice

(how to get sweeter terms on the deal), the key to privilege is an attorney acting in the traditional role of providing legal advice. As Fielden played, at best, a dual role for the client, his status as an attorney does not render his communications automatically privileged.

### The Client

The Court is also not persuaded as to the status of O'Neill as "client." While the Owner asserts that O'Neill's status as Owner Representative is *per se* sufficient to charge O'Neill with client status, the record before the Court is inadequate to establish this conclusion. At hearing, counsel noted that Mr. O'Neill was a non-employee, and only the first of several Owner Representatives hired for the Project. Thus, O'Neill was never an officer, director or even employee of the corporation, but was always, at best, a third party agent. There was no evidence introduced with respect to the scope of O'Neill's authority to deal with lawyers on behalf of the corporation, and, as set forth above, the heightened scrutiny applied to assertion of the privilege by a corporation requires at least a some showing that the authority granted to O'Neill was sufficient to bind O'Neill to secrecy per the privilege.

### Confidences

Even if we were to assume that the communications above were sought in the context of providing legal advice to a client (a conclusion that is by no means apparent), the crux of any claim of privilege is an intent that the communication be confidential. A review of all of the circumstances presented here compels a communication that these particular emails were never intended by either the "lawyer" or the "client" to be confidential.

The Court notes that the first email specifically refers to and reiterates a discussion between O'Neill, Fielden and *Pertree* -- a third party. Obviously, the inclusion of Pertree vitiates any claim

-6-

of privilege with respect to the discussion. Moreover, the email itself discloses no confidences, but merely asks O'Neill to make sure Pertree enters the license number in the document *already sent to Pertree*. The message directs O'Neill to take action that necessarily cannot be accomplished without disclosing the communication itself. Indeed, how can O'Neill communicate the desired action (getting Pertree to fill in the blank) without disclosing the desired action to Pertree? There is simply no indication on this record that the parties intended that the communications associated with this email would be confidential.

The second email is more problematic. That communication does two things: 1) it asks O'Neill to review the contract when it is received from Pertree in order to ascertain whether Pertree did, indeed, fill in the blank and 2) discusses the legal consequences of such an action or inaction. As the actual execution of the contract is a matter of fact involving a third party, an inquiry as to what the document contains is likely not privileged (although the response may be). A closer call is the legal analysis provided in the email regarding the implications of the execution of the contract. If all the Court had before it was the email itself, a strong argument could be made that the parties intended this analysis to be kept confidential. A review of the record, however, convinces the Court otherwise.

The Contractor asserts, without contradiction, that Fielden personally contacted him throughout the negotiation process and, on November 17, 2003, Fielden left Pertree a voice message that includes the following:

> I assume the ah shell corporation, you guys have transferred a uh, somebody in your company has transferred a uh general contractor's license to the shell corporation, umm, this new LLC. If you haven't, you guys need to do that right away because there is no way the lender is going to allow you guys to do umm this new company with uh, that doesn't have a GC license. Umm, cause, in fact the lender is going to require the contract to have your license number in the contract so please look at those issues right away.

(Doc. No. 60-2).

This is consistent with the first email which verifies that the parties communicated with Pertree regarding this issue, and negates any confidential intent regarding the need for a GC license, and supplying the license number in the contract.

The most persuasive evidence of the lack of confidential intent, however, is from Fielden himself. At hearing, the parties noted that Fielden reviewed numerous records over a course of three to four months in preparing the response to the Request for Production and withheld hundreds of documents under a claim of privilege.[2] Yet, despite four months of review, Fielden did *not* claim privilege as to the emails in question, *nor as to approximately a dozen other emails between O'Neill, Eichenblatt and Fielden.* In fact, as represented at the hearing, the Owner did not claim privilege on the log as to *any* such communication between O'Neill and Fielden, and did not file an objection to the Request to Produce documents served on O'Neill's company. While allowing an email or two to inadvertently escape such a thorough review might be understandable, the only conclusion that can be drawn from failing to claim privilege on *any* such communication between these individuals is that Fielden simply did not believe the communications were, in fact, privileged.[3] This is especially so in light of the fact that the emails at issue here were authored by Fielden and presumably resided on his computer email account, and were produced by the Owner (and not O'Neill). In the Court's experience, while a lawyer may inadvertently overlook a privileged document lurking in the client's files, it is exceptionally rare for an attorney to unwittingly produce a privileged document from his or her *own* files. Mr. Fielden affidavit as to how the emails came to be produced is terse to the point

---

[2] The privilege log is reported to be 59 pages long.

[3] Certainly, the recipient of the communications (Mr. O'Neill) did not believe the communications to be privileged, as evidenced by his Affidavit.

-8-

of near nothingness. Mr. Fielden does nothing other than state the conclusion that the production was inadvertent and unintentional. He offers no description of the actual effort to review documents and avoid producing privileged material. Because these are electronic documents (whether from the files of the sender or the recipients), identifying them as from an attorney should have been automatic. If, indeed, Mr. Fielden considered the emails privileged, he has offered no explanation as to how they ended up being produced. Lacking a credible explanation from Mr. Fielden, the Court is left to the obvious conclusion: the documents were produced because none of the participants believed the communication to be confidential.

In view of the failure to assert privilege on any Fielden/O'Neill email, and the failure to object to the Request for Production made to O'Neill's company, the belated claim of privilege seems, at best, an afterthought. This record does not support a finding that these two emails are entitled to protection under the attorney-client privilege.

**Waiver**

Assuming that the Court is incorrect and the emails are privileged, the Contractor argues that any privilege that did attach was waived by their production (and, apparently, O"Neill's willingness to discuss the documents in his Affidavit). Although there are cases that indicate that disclosure waives the privilege,[4] the majority rule in Florida courts seems to favor a more balanced approach toward disclosures that are claimed to be inadvertent. *See Gen. Motors Corp. v. McGee*, 837 So.2d 1010 (Fla. 4th DCA 2002) (holding that the inadvertent disclosure of a privileged document does not waive the attorney-client privilege if attorney took all reasonable steps to avoid disclosure and

---

[4] *See Hamilton v. Hamilton Steel Corp.*, 409 So.2d 1111, 1114 (Fla. 1982)("It is black letter law that once the privilege is waived, and the horse out of the barn, it cannot be reinvoked."); and *Ray v. Cutter Labs. Div. of Miles, Inc.*, 746 F. Supp. 86,88 (M.D. Fla. 1990) (noting the traditional "strict responsibility " doctrine).

asserted the privilege as soon as the disclosure became known); *Abamar Hous. & Dev., Inc. v. Lisa Daly Lady Decor, Inc.*, 698 So.2d 276, 278-279 (Fla. 3d DCA 1997) (Under the "majority rule" or the "relevant circumstances test," a court determines whether an inadvertent production amounts to a waiver of the privilege by weighing the following factors: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) any delay and measures taken to rectify the disclosures; and (5) whether the overriding interests of justice would be served by relieving a party of its error.").

Applying these factors here, the Court holds that any privilege was waived. In the first instance, the Court finds little to support the conclusion that production was inadvertent. As indicated above, there is no explanation offered as to how *none* of the communications between the claimed agent of the Owner and the claimed corporate counsel were withheld as privileged. Absent some indication as to how the documents could have been overlooked, the lengthy and elaborate privilege review process actually works against the Owner's argument. As to the time taken to rectify the error, it appears that the Owner's attorney first learned of the production upon receipt of the Contractor's memorandum and Affidavit of O'Neill, and timely moved to strike. The next two factors (the number of the disclosures and the extent of disclosure) weigh in favor of finding waiver. As noted above, a substantial privilege log and a supplemental privilege log was tendered, neither of which listed any of the dozen O'Neill/Fielden/Eichenblatt documents, and the Owner tendered no objection to the Request for documents served on O'Neill's company, although it did so for other third party record requests. Such actions are inconsistent with a claim that the Owner was vigilant in protecting these documents from disclosure.

The final factor is fairness. At hearing, the Owner emphasized repeatedly that it did not feel that the disclosed communications hurt the Owner's case in any way. Conversely, the Contractor relies heavily on the documents to support its contention of estoppel. Additionally, the underlying *facts* of what the Owner and Owner's Representative knew or did not know about the status of the GC license is not privileged, and the nature of these communications was clearly related to a business purpose (executing a contract) and not a pending or even contemplated lawsuit. In view of all of the circumstances, the fairness factor tips in favor of waiver.

The Court therefore concludes that the documents are no longer protected by attorney-client privilege, if, in fact, they ever were, and thus, the motions are **denied.**

**DONE** and **ORDERED** in Orlando, Florida on January 27, 2006.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record